1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   CLARENCE EDWARD YOUNG,

11              Petitioner,              No. CIV S-09-CV-2999 MCE CHS P

12        vs.

13   D.K. SISTO,[1]

14              Respondent.            FINDINGS AND RECOMMENDATIONS

15   _____/

16                          **I.  INTRODUCTION**

17        Petitioner, Clarence Edward Young, is a state prisoner proceeding pro se with a

18   petition for writ of *habeas corpus* pursuant to 28 U.S.C. § 2254.[2]  Petitioner is currently serving an

19   _____

20        [1] Gary Swarthout is substituted for his predecessor, D.K. Sisto, as the current acting warden
     at California State Prison, Solano, where Petitioner is currently incarcerated, pursuant to Fed. R. Civ.
21   P. 25(d).

22        [2] Petitioner has also filed a motion for the appointment of counsel together with his *habeas
     corpus* petitioner.  There currently exists no absolute right to appointment of counsel in habeas
23   corpus proceedings. *See Nevius v. Sumner*, 105 F.3d 453, 460 (9th Cir. 1996).  However, 18 U.S.C.
     § 3006A authorizes the appointment of counsel at any stage of the case "if the interests of justice
24   so require." *See* Rule 8(c), Fed. R. Governing § 2254 Cases.  In making this determination, the court
     evaluates the likelihood of success on the merits and the ability of Petitioner to articulate his claims
25   *pro se* in light of the complexity of the legal issues involved. *Weygandt v. Look*, 718 F.2d 952, 954
     (9th Cir.1983).  Here, Petitioner has articulated his claims reasonably well and the issues presented
26   are not complex.  Therefore, the interests of justice do not require the appointment of counsel at this
     time.

                                          1

indeterminate sentence of twenty-two years to life following his 1987 conviction in Fresno County Superior Court for second degree murder with two penalty enhancements.  Here, Petitioner does not challenge the constitutionality of that conviction, but rather, the execution of his sentence, and specifically, the August 23, 2007 decision by the Board of Parole Hearings finding him unsuitable for parole.

## II.  ISSUES PRESENTED

Petitioner alleges five grounds for relief in his pending petition.  Specifically, Petitioner's claims are as follows:

(1)    Petitioner's commitment offense does not constitute "some evidence" to support the Board's August 23, 2007 denial of parole.

(2)    Denial of parole based an immutable factors, specifically Petitioner's commitment offense, violated Petitioner's right to due process of law.

(3)    The Board failed to consider all relevant and reliable information in making its determination that Petitioner was unsuitable for Parole.

(4)    Section 2402(c)(1) of the California Code of Regulations is unconstitutionally vague, and therefore void.

(5)    The Board violated the Separation of Powers Doctrine by appropriating to itself absolute power over parole matters.

Since the allegations in Petitioner's first three claims all assert due process violations in relation to the sufficiency of the evidence, they will be addressed together herein as a single issue in section (V)(A), below.  Petitioner's claims four and five are considered separately in sections (V)(B)(1) and (V)(B)(2), respectively.  After careful consideration of the record and applicable law, it is recommended that this petition for writ of *habeas corpus* relief be denied.

## III. FACTUAL BACKGROUND

The basic facts of Petitioner's life crime were summarized by the Presiding Commissioner at Petitioner's parole hearing as follows:

On July 31, 1986 at approximately 4:49 p.m. Fresno County police

officers were dispatched to 1425 [North] Ninth Street . . . Upon arrival officers observed a large group of people standing around an orange Dodge two-door coup parked in the northeast corner of the apartment complex.  A serious disturbance had occurred between white and black men armed with guns and baseball bats.  People began yelling that a man had been shot in the face and needed a doctor.  Located within the vehicle was witness Rosemary Richmond, who was sitting in the front passenger seat holding a male subject on her lap.  The victim was later identified as Vernon Lawrence Witcher . . . The police observed that the victim was unconscious and bleeding badly from the face.  The paramedics were called and responded to the scene.  They administered first aid and transported the victim to the Fresno Valley Medical Center, where he subsequently died. Dr. C.P. Nelson, pathologist, stated that the cause of death was a bullet hole in the head.  The driver of the vehicle that drove into the apartment complex where the incident took place was identified as Clarence Young.  The investigation revealed that Young took one step back, then raised his hand directly in the face of victim Vernon Witcher, and fired one shot into his face.  The death of Vernon Witcher was a culmination of a racial frackus between a group of white and black persons who had been drinking alcohol in the apartment.  Young was said to have been drinking beer and brandy that day by witness Ronny Lewis.  Young also was seen leaving the apartment holding a dark blue steel .25 automatic handgun.

. . . .

Young stated that he did not murder Vernon Witcher.  Young stated, "It was Ronny Lewis that had shot the victim.  Although I deny committing the murder, I do admit to being responsible for the death of the victim."  A white male and white female were walking on the street in Fresno, who made disparaging remarks to Young and his friends.  Young stopped his vehicle and a physical confrontation occurred with one of his friends and the white male.  They drove off and later discovered each other out at an apartment complex.  Young stated the white men came in and started beating on the door and challenged Young and his friends to fight.  Young stated one of the white men was armed with a bat.  He observed the other persons in his group to have guns.  He stated the whites would not leave and continued to harass the blacks.  Young heard a shot, saw the victim fall, and then ran.

(Parole Hr'g Tr. 11:19-14:12, Aug. 23, 2007, Pet. Ex. A)

Following a jury trial, Petitioner was convicted of second degree murder with penalty enhancements for using a firearm and for a prior felony conviction.  He was sentenced to twenty-two years to life in prison.  Petitioner's minimum eligible parole date passed on December

21, 2000.  On August 23, 2007, Petitioner appeared before the Board of Parole Hearings (the "Board") for his fourth subsequent parole hearing.  After considering various positive and negative suitability factors, including the nature of the commitment offense, the panel concluded that Petitioner would pose an unreasonable risk of danger to society if released, and concluded that he was not suitable for parole.  Petitioner sought *habeas corpus* relief in the Fresno County Superior Court.  On September 15, 2008, the court denied his petition, finding that the Board's determination that Petitioner was unsuitable for parole was supported by some evidence.  The California Court of Appeal, Fifth District, and the California Supreme Court denied relief without comment.  Petitioner filed this federal petition for writ of *habeas corpus* on October 27, 2009.  Respondent filed an answer on January 15, 2010, and Petitioner filed his traverse on February 9, 2010

## IV.  APPLICABLE STANDARD OF HABEAS CORPUS REVIEW

This case is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of *habeas corpus* filed after its enactment on April 24, 1996.  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *Jeffries v. Wood*, 114 F.3d 1484, 1499 (9th Cir. 1997).  Under AEDPA, an application for a writ of habeas corpus by a person in custody under a judgment of a state court may be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 n. 7 (2000).  Federal *habeas corpus* relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  *See also Penry v. Johnson*, 531 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).  This court looks to the last reasoned state court decision in determining whether the law applied to a particular

1    claim by the state courts was contrary to the law set forth in the cases of the United States Supreme

2    Court or whether an unreasonable application of such law has occurred. *Avila v. Galaza*, 297 F.3d

3    911, 918 (9th Cir. 2002).

### V.  DISCUSSION

**A.  Due Process: Sufficiency of Evidence (Claims One, Two and Three)**

6          Petitioner alleges in three related claims that the Board's 2007 decision violated his

7    federal right to due process of law.  First, Petitioner claims that his commitment offense alone does

8    not constitute "some evidence" that he remains a current risk to public safety.  Petitioner's second

9    claim is the Board impermissibly relied upon his commitment offense, an immutable factor, in

10    finding him unsuitable for parole.  Third, Petitioner claims that the Board did not consider all

11    available relevant and reliable information in making its parole suitability determination, thus failing

12    to afford Petitioner individualized consideration of the specific facts and circumstances surrounding

13    Petitioner's commitment offense and post-conviction history.  Because the allegations in Petitioner's

14    claims all assert due process violations in relation to the sufficiency of evidence supporting the

15    Board's parole decision, they will be addressed together herein as a single issue.

16          The Due Process Clause of the Fourteenth Amendment to the United States

17    Constitution prohibits state action that "deprive[s] a person of life, liberty or property without due

18    process of law." U.S. CONST. AMEND. XIV, § 2.  A person alleging a due process violation must first

19    demonstrate that he or she was deprived of a protected liberty or property interest, and then show

20    that the procedures attendant upon the deprivation were not constitutionally sufficient. *Ky. Dep't.*

21    *Of Corrs. v. Thompson*, 490 U.S. 454, 459-60 (1989); *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th

22    Cir. 2002).  A protected liberty interest may arise from either the Due Process Clause itself or from

23    state laws. *Bd. of Pardons v. Allen*, 482 U.S. 369, 373 (1987).  In the context of parole, the United

24    States Constitution does not, in and of itself, create a protected liberty interest in the receipt of a

25    parole date, even one that has already been set. *Jago v. Van Curen*, 454 U.S. 14, 17-21 (1981).  If

26    a state's statutory parole scheme uses mandatory language, however, it "'creates a presumption that

1   parole release will be granted' when or unless certain designated findings are made, thereby giving

2   rise to a constitutional liberty interest." *McQuillan*, 306 F.3d at 901 (quoting *Greenholtz v. Inmates*

3   *of Neb. Penal*, 442 U.S. 1, 12 (1979)).

4          California state prisoners serving indeterminate prison sentences "may serve up to

5   life in prison, but they become eligible for parole consideration after serving minimum years of

6   confinement." *In re Dannenberg*, 34 Cal.4th 1061, 1078 (2005).  California's statutory scheme

7   governing parole eligibility for indeterminately sentenced prisoners provides, generally, that a

8   release date will be granted unless the Board determines that "the gravity of the current convicted

9   offense or offenses, or the timing and gravity of current or past convicted offense or offense, is such

10  that consideration of the public safety requires a more lengthy period of incarceration." CAL. PENAL

11  CODE § 3041(b).  California state prisoners whose sentences carry the possibility of parole,

12  therefore, have a clearly established, constitutionally protected liberty interest in the receipt of a

13  parole release date.  *Allen*, 482 U.S. at 377-78 (quoting *Greenholtz v Inmates of Neb. Penal*, 442

14  U.S. 1, 12 (1979)).  *See also Irons v. Carey*, 505 F.3d 846, 850-51 (9th Cir. 2007) (citing *Sass v. Cal.*

15  *Bd. of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006)); *Biggs v. Terhune*, 334 F.3d 910, 914 (9th

16  Cir. 2003); *McQuillion*, 306 F.3d at 903.

17         Despite the existence of this liberty interest, it is well established that inmates are not

18  guaranteed the "full panoply of rights" during a parole suitability hearing as are normally afforded

19  to criminal defendants under the Due Process Clause.  *See Pedro v. Or. Parole Bd.*, 825 F.2d 1396,

20  1398-99 (9th Cir. 1987).  Nonetheless, inmates are afforded limited procedural protections.  The

21  Supreme Court has held that a parole board, at minimum, must give an inmate an opportunity to be

22  heard and a decision informing him of the reasons he did not qualify for parole.  *Hayward v.*

23  *Marshall*, 603 F.3d 546, 560 (9th Cir. 2010) (citing *Greenholtz*, 442 U.S. at 16).  In addition, as a

24  matter of state constitutional law, denial of parole to California inmates must be supported by "some

25  evidence" demonstrating that the inmate poses an unreasonable risk of danger to society.  *Hayward*

26  *v. Marshall*, 603 F.3d 546, at 562 (citing *In re Rosenkrantz*, 29 Cal.4th 616 (2002)).  *See also In re*

6

1    *Lawrence*, 44 Cal.4th at 1191 (recognizing the denial of parole must be supported by "some

2    evidence" that an inmate "poses a current risk to public safety"); *In re Shaputis*, 44 Cal.4th 1241,

3    1254 (2008) (same).  "California's 'some evidence' requirement is a component of the liberty

4    interest created by the parole system of [the] state," *Cooke v. Solis*, 606 F.3d 1206, 1213 (9th Cir.

5    2010), making compliance with this evidentiary standard mandated by the federal Due Process

6    Clause.  *Pearson v. Muntz*, 606 F.3d 606, 609 (9th Cir. 2010).

7              It is thus clear that Petitioner was entitled to an opportunity to be heard during his

8    parole hearing, a decision supported by some evidence that he remained a current risk to public

9    safety, and to be informed of the reasons that he did not qualify for parole.  In this case, Petitioner

10   does not contend that he was not afforded an opportunity to be heard during his parole hearing.

11   Indeed, the record reflects that the Board conducted Petitioner's hearing interactively, and Petitioner

12   was given opportunities not only to answer questions posed to him by the Board, the District

13   Attorney, and his own attorney, but also to personally address the Board prior to its deliberation.

14   Nor does Petitioner contend that the Board failed to inform him of the reasons upon which it based

15   its determination that he did not qualify for parole.  In fact, Petitioner's three due process claims all

16   focus on the sufficiency of the evidence cited by the Board in support of its determination that

17   Petitioner was unsuitable for parole because he posed a current risk to public safety.

18             The analysis of whether a California parole board's suitability decision was supported

19   by "[some evidence] is framed by the [state's] statutes and regulations governing parole suitability

20   determinations . . . ." *Irons*, 505 F.3d at 851.  A federal court undertaking review of a "California

21   judicial decision approving . . . [the Board's] decision rejecting parole" must determine whether the

22   state court's decision "was an 'unreasonable application' of the California 'some evidence'

23   requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'"

24   *Hayward*, 603 F.3d at 562-63 (quoting 28 U.S.C. § 2254(d)(2)).  Accordingly, this court must "look

25   to California law to determine the findings that are necessary to deem a prisoner unsuitable for

26   parole, and then must review the record to determine whether the state court decision holding that

these findings were supported by 'some evidence' [] constituted an unreasonable application of the 'some evidence' principle." *Irons*, 505 F.3d at 851.

Title 15, Section 2402 of the California Code of Regulations sets forth various factors to be considered by the Board in making its parole suitability findings for prisoners convicted of murder. The regulation is designed to guide the Board's determination of whether the inmate would pose an "unreasonable risk of danger to society if released from prison," and, thus, whether he or she is suitable for parole. *In re Lawrence*, 44 Cal.4th at 1202. The Board is directed to consider all relevant and reliable information available, including

> the circumstances of the prisoner's: social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

15 CAL. CODE REGS. § 2402(b). In addition, the regulation sets forth nine specific circumstances tending to demonstrate suitability for parole and six specific circumstances tending to demonstrate unsuitability for parole:

> (c) Circumstances Tending to Show Unsuitability. The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate unsuitability include:
>
> (1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner...
>
> (2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.
>
> (3) Unstable social history. The prisoner has a history of unstable or tumultuous relationships with others.

(4) Sadistic Sexual Offenses.  The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors.  The prisoner has a lengthy history of severe mental problems relating to the offense.

(6) Institutional Behavior.  The prisoner has engaged in serious misconduct in prison or jail.

(d) Circumstances Tending to Show Suitability.  The following circumstances each tend to show that the prisoner is suitable for release.  The circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel.  Circumstances tending to indicate suitability include:

(1) No Juvenile Record.  The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History.  The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse.  The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for Crime.  The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome.  At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

(6) Lack of Criminal History.  The prisoner lacks any significant history of violent crime.

(7) Age.  The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for the Future.  The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release.

15 CAL. CODE REGS. § 2402(c) & (d).

The overriding concern is public safety, *In re Dannenberg*, 34 Cal.4th at 1086, and the focus of the inquiry is on the inmate's current dangerousness. *In re Lawrence*, 44 Cal.4th at 1205. Accordingly, under California law, the standard of review is not whether some evidence supports the reasons cited for denying parole, but whether some evidence indicates that an inmate's release would unreasonably endanger public safety. *In re Shaputis*, 44 Cal.4th at 1254. Therefore, "the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to the determination that a prisoner remains a danger to the public." *In re Lawrence*, 44 Cal4th at 1212. In other words, there must be a rational nexus between the facts relied upon and the ultimate conclusion that the prisoner continues to be a threat to public safety. *Id*. at 1227.

In Petitioner's case, the record reflects that the Board considered Petitioner's criminal, social and family history, his attitude towards the commitment offense, his institutional disciplinary record, his personal progress since becoming incarcerated, his history of drug and alcohol use and treatment, his psychological evaluations, his post-incarceration plans for employment and residence, and letters of support from family members. Although many applicable regulatory criteria tended to indicate that Petitioner was suitable for parole, the Board's decision to deny parole did not violate his right to due process because it is supported by some evidence.

Petitioner was born in Fresno, California in 1962, and was forty-five years old at the time of his August 2007 hearing. Petitioner's parents separated when he was young and subsequently divorced. Petitioner explained to the Board that after his parents divorced, he "got kind of wild" and "into the street life," and his mother was no longer able to control him. (Pet. Ex. A at 23) He was ultimately kicked out of high school in his final semester of twelfth grade for poor attendance. Petitioner confirmed that his lifestyle during that time period involved a lot of drinking

and a lot of violence, though he did not blame the commitment offense on substance use.  Petitioner also admitted that he sold PCP, but indicated that his personal drug use was limited solely to the occasional use of marijuana.

Petitioner has no juvenile record.  Petitioner's adult criminal record, however, consists of several arrests and convictions.  In 1980, he was arrested for auto theft when a friend loaned him a stolen moped, but pled guilty to receiving stolen property and was sentenced to three years probation.  In 1981, Petitioner was arrested for robbery with a weapon.  He was found guilty by a jury, but he received credit for 241 days served and was excluded from the Youth Authority. Instead, he was sent on a diagnostic evaluation to Vacaville for 90 days and subsequently served a period of probation.  In 1984, Petitioner was arrested for assault with a deadly weapon and great bodily injury when he entered an adult bookstore without the proper identification and engaged in an altercation with the store owner.  The assault charge was dismissed, but Petitioner pled guilty to disturbing the peace.  In 1986, Petitioner was arrested for giving false identification to a law enforcement officer.  Petitioner was also arrested on an unspecified date for selling PCP, but that charge was later dismissed.  Petitioner's criminal history culminated with his arrest and conviction for the commitment offense.  Petitioner was on probation at the time of the commitment offense.

Since entering prison, Petitioner has availed himself of available, relevant self-help programming within the institution.  In fact, the Board noted that Petitioner's institutional programming has been "exemplary."  (Pet. Ex. A at 75.)  Petitioner has completed a number of self-help courses, including "Stress Management," "Parenting Program," "Men's Violence Prevention," "Anger Management," "Youth Adult Awareness Program," and "Forty Days of Purpose."   In addition to self-help courses, Petitioner has participated in the "Victim Offender Reconciliation Group" ("VORG") which is, according to the Board, "the most important/popular program this institution has to offer."  (Pet. Ex. A at 74.)   Petitioner has also has taken the initiative to start a support group of his own.  The purpose of the group is to encourage fellow inmates who may otherwise have no support or encouragement from other sources to, *inter alia*, "do the right thing,

1   get into college, go get a vocation, go get your GED . . . ."  (Pet. Ex. A at 61.)

2           Petitioner has upgraded educationally and vocationally during his time in prison.  He

3   obtained his GED in 1991.  He has gained marketable work experience by obtaining a vocational

4   certificate in electrical work, as well as vocational training in masonry, plumbing, mechanical

5   drawing, print shop, office services and related training.  While incarcerated, he has held several

6   different jobs, including as a library clerk and a reentry clerk.  At the time of the 2007 parole

7   hearing, Petitioner was working in Office Services and Related Technology ("OSRT").

8           Petitioner has maintained consistent and meaningful contact with many of his famiily

9   members while incarcerated, and he produced realistic evidence of parole plans.  By Petitioner's

10   account, his family is very close knit and supportive, and he receives regular visits from his mother,

11   father, oldest sister and youngest sister.  Petitioner also maintains contact with family members and

12   friends who do not reside within driving distance of the prison by letters and phone calls.  He

13   produced letters from his mother and sister, both of whom offered him support and a place to live

14   upon his release.  Petitioner also produced a letter of support from his aunt.  In addition to his

15   family's support and residential offerings, Petitioner had two offers of employment, which the Board

16   twice noted looked "pretty good."  (Pet. Ex. A at 51 and 76)  One employment offer consisted of a

17   position at his sister's company, where he would be responsible for repair and maintenance of rental

18   properties, lawn servicing, simple plumbing, electrical repairs, and painting.  (Pet. Ex. A. At 45-47.)

19   Petitioner also had a letter from Thomaco Property Management, his mother's employer, offering

20   an unspecified position.

21           Petitioner has eight children, three of whom are minors.  Petitioner indicated he

22   understood that he may be responsible for child support upon his release, and stated that he was

23   more than willing to support his children and make sacrifices so that they will have good lives.

24   Petitioner attends church regularly in prison and intends to continue his attendance upon his release.

25   Accordingly, he presented a letter of support from the church his mother and grandmother attend

26   in Fresno, True Light Community Church.  He stated that religion has helped him to stay on track

1    when he gets down, and that he turns to God for strength.  Lastly, Petitioner produced a letter of

2    support from Bridging the Gap, a group that helps fellow alcoholics in recovery, and indicated his

3    intention to continue substance abuse treatment outside the confines of prison.  The Board noted that

4    Petitioner's parole plans were "pretty good."  (Pet. Ex. A at 51.)

5            Petitioner's institutional disciplinary record is, in words of the Board, "exemplary."

6    (Pet. Ex. A at 74.)  At the time of his suitability hearing, he had achieved a classification score of

7    nineteen, the lowest classification score possible given the specific facts and circumstances

8    surrounding his incarceration.  Throughout the course of his incarceration, Petitioner has incurred

9    approximately ten CDC Form 128-A Custodial Counseling Chronos for minor misconduct, although

10   at the time of his 2007 hearing, it had been seven or eight years since his last violation occurred.[3]

11   In addition, Petitioner incurred only one of the more serious CDC Form 115 Rules Violation Reports

12   throughout the course of his incarceration, in February 1996 for mutual combat.[4]

13           Petitioner displayed signs of remorse and insight with regard to the commitment

14   offense. The Board recognized that Petitioner had accepted responsibility for his role in the offense,

15   and Petitioner noted that he would live that day over if he could.  Petitioner expressed that during

16   the period of time leading up to the commitment offense, he was making the wrong lifestyle choices

17   despite many people trying to help him.  He stated that he was disappointed in the person that he

18   once was, but since becoming incarcerated he has worked hard to recondition his mind set and to

19   become a better person.  Petitioner no longer considered himself the same person he was at the time

20   of the commitment offense, noting that he recognized a lot of immaturity in his past, but believed

21   he had matured greatly, learned to think before reacting, the difference between right and wrong,

22   and no longer wants to harm people, to cheat, or to steal.

23

24           [3] CDC Form 128-A, a "Custodial Counseling Chrono," documents incidents of minor inmate

25   misconduct and the counseling provided.  Cal. Code Regs., tit. 15 § 3312 subd. (a)(2).

26           [4] CDC Form 115, a "Rules Violation Report," documents conduct that is believed to be a
     violation of the law or that is not minor in nature.  Cal. Code Regs., tit. § 3312 subd. (a)(3).

13

Petitioner's most recent psychological evaluation, conducted in July 2004, estimated that he posed a "low" risk of future dangerousness to the community. According to the evaluator, Petitioner's statement regarding his culpability for the offense has remained consistent over time, with Petitioner denying being the actual shooter of the victim, but nonetheless accepting responsibility for the victim's death and his role in the altercation. In fact, the evaluator noted that Petitioner expressed a "great deal of empathy and remorse for the victim, as well as the victim's family." (Pet. Ex. F at 1.) The evaluator opined that Petitioner has "made the most appropriate personal, social and behavior adjustments in this institutional setting," and that he "has demonstrated appropriate impulse control." (Pet. Ex. F at 3.) The Board expressed concern that the 2004 report may be outdated as it was over three years old at the time of the hearing. In addition to the 2004 report, the Board considered Petitioner's March 2000 psychological evaluation, which opined that Petitioner "is considered to be a lower than average risk for acting out within a controlled setting. If released to the community, he appears to present a lower than average risk of dangerousness based on his strong family support, his current mental and emotional disposition and level of remorse towards the victim." (Pet. Ex. F at 7.)

Thus, Petitioner has no juvenile record, 15 CAL. CODE REGS. § 2402(d)(1), and no history of sadistic sexual offenses, 15 CAL. CODE REGS. § 2402(c)(4). There is no evidence that Petitioner has suffered from severe mental problems or that he has psychological problems that would bear on his parole suitability. 15 CAL. CODE REGS. § 2402(c)(5). While at the time of the commitment offense, his relationship with his family may have been somewhat tumultuous, by all accounts his family relationship is now quite positive, stable, and supportive, and it appears that Petitioner has maintained continuous contact with many family members. 15 CAL. CODE REGS. § 2402(c)(3) and (d)(2). Petitioner has attained the lowest classification score possible and his prison disciplinary record is "exemplary," with his only "115 disciplinary report incurred in 1996, eleven years prior to the date of his parole hearing. 15 CAL. CODE REGS. § 2402(c)(6). The psychological evaluations from both 2004 and 2000 indicate that Petitioner has accepted responsibility for his role

14

1    in the murder and consistently expressed remorse for his crime. 15 CAL. CODE REGS. § 2402(d)(3).

2    Petitioner has participated in activities in prison that indicate an enhanced ability to function within

3    the law upon release. 15 CAL. CODE REGS. § 2402(d)(9). Petitioner has also developed marketable

4    skills and made realistic plans for his release. 15 CAL. CODE REGS. § 2402(d)(9). Nonetheless, the

5    Board found that the positive factors demonstrating Petitioner's suitability for parole did not

6    outweigh the negative factors demonstrating his unsuitability.

7        In determining that Petitioner was not yet suitable for parole, the Board relied in large

8    part on the facts and circumstances of his commitment offense. Petitioner contends the Board's

9    reliance on his commitment offense, an immutable factor, to support its denial of parole violated

10    his right to due process of law because his commitment offense cannot be considered "some

11    evidence" that he remains and unreasonable risk of danger to society.

12        A prisoner's commitment offense can be a parole unsuitability factor if it was

13    committed in an especially heinous, atrocious or cruel manner. 15 CAL. CODE REGS. § 2402(c)(1).

14    Given the liberty interest that California prisoners possess in their release on parole, however, the

15    Ninth Circuit has cautioned that continued reliance on an unchanging factor, such as a prisoner's

16    commitment offense or pre-incarceration conduct, to support a finding of unsuitability may, over

17    time, constitute a violation of due process where there is evidence of rehabilitation and the prisoner

18    has served the minimum term of years on his sentence. *Irons*, 505 F.3d at 852-53. Thus, in order

19    for the circumstances of a commitment offense to support the denial of parole, there must be

20    "something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and

21    mental state," that indicates "the implications regarding the prisoner's dangerousness that derive

22    from his or her commission of the commitment offense remain probative to the statutory

23    determination" of the prisoner's current or future dangerousness. *Cooke*, 606 F.3d at 1216 (quoting

24    *In re Lawrence*, 44 Cal.4th at 1214). "[T]here must be more than the crime or its circumstances

25    alone to justify the Board's . . . finding of current dangerousnes." *Id*. at 1214 (citing *Lawrence*, 44

26    Ca.4th at 1214).

1          Under the applicable state regulations, factors relating to a commitment offense tend

2   to show unsuitability for parole where the offense was committed in an "especially heinous,

3   atrocious or cruel manner," such as (A) multiple victims were attacked, injured or killed; (B) the

4   offense was carried out in a dispassionate and calculated manner, such as an execution style murder;

5   (C) the victim was abused, defiled or mutilated; (D) the offense was carried out in a manner which

6   demonstrates an exceptionally callous disregard for human suffering; or (E) the motive for the crime

7   is inexplicable or very trivial in relation to the offense.  15 CAL. CODE REGS. § 2402(c)(1)(A)-(E).

8   Here, the Board determined that Petitioner's commitment offense fits the regulatory scheme for one

9   that was committed "in an especially heinous, atrocious or cruel manner."  15 CAL. CODE REGS. §

10  2402(c)(1), finding three of the above factors to be supported in the record.

11         Specifically, the Board found that multiple victims were attacked.  15 CAL. CODE

12  REGS. § 2402(c)(1)(A).  In support of this finding, the Board noted that in that two groups of people

13  were fighting and "[e]verybody was drunk.  It sounds like a brouhaha so to speak."  Pet. Ex. A at

14  73.

15         The Board also found that the commitment offense was carried out in a manner

16  demonstrating an exceptionally callous disregard for human suffering.  15 CAL. CODE REGS. §

17  2402(c)(1)(D).  This determination is supported by evidence in the record indicating that Petitioner

18  shot the victim in the face at close range after a series of racially charged altercations occurring

19  throughout the course of one day.

20         Lastly, the Board cited Petitioner's motive for the offense.  15 CAL. CODE REGS. §

21  2402(c)(1)(E).  In order to fit the regulatory description for an inexplicable or trivial motive for an

22  offense, a prisoner's motive must have been *more* trivial than those which conventionally drive

23  people to commit the offense in question.  *See In re Scott*, 119 Cal.App.4th 871, 893 (2004)

24  (reasoning that all motives for murder could reasonably be deemed "trivial").  The rationale behind

25  this factor is that one whose motive is unintelligible or cannot be explained may be unusually

26  unpredictable and dangerous.  *Id.*  Here, the Board considered Petitioner's motive to be inexplicable

16

in that the crime "was just a massiveness of human emotion and disrespect and racism . . . all

coupled with drugs and alcohol,"which is certainly trivial in relation to taking a human life.  Under

the circumstances of this case, where Petitioner's conduct was so heinous, a conclusion that he may

be unusually unpredictable and dangerous due to his inexplicable motive is not unreasonable.

While the commitment offense is indeed an immutable factor that Petitioner is forever

unable to change, this is not a case where continued reliance on such a factor rises to the level of a

due process violation.  Although many positive factors exist in support of Petitioner's rehabilitation

and his suitability for parole, he had not yet served the minimum term of his sentence.[5]  *See Irons*,

505 F.3d at 852-53.  Petitioner was convicted by a jury on May 29, 1987, and he was sentenced to

a term of 22 years to life imprisonment on September 15, 1987.  Thus, at the time of his August 23,

2007 parole hearing, Petitioner had only served twenty years of his twenty-two year minimum term.

Moreover, his commitment offense could properly be characterized as "especially heinous, atrocious

or cruel" as Petitioner shot the victim in the face at close range during what appears to have been

a series of racially charged altercations between a group of Caucasians and a group of African

Americans.  Lastly, the Board did not rely on the static factors of the commitment offense alone to

find him unsuitable for parole.  *See Cooke*, 606 F.3d at 1216 (requiring something in a prisoner's

"pre- or post-incarceration history, or his current demeanor and mental state" to indicate that the

commitment offense remains probative to the statutory determination of current or future

dangerousness).  To the contrary, in addition to the nature of Petitioner's commitment offense,

specifically the multiple victims, the callous disregard demonstrated by Petitioner for human

suffering, and the trivial or inexplicable motive, the Board also relied on Petitioner's inconsistent

participation in substance abuse programming.  These factors, considered together, find support in

---

[5] Petitioner's "minimum term" is not to be confused with his "minimum eligible parole date."
A minimum term is the minimum number of years imposed by a prisoner's sentence, in this case
twenty-two years.  A "Minimum Eligible Parole Date," or "MEPD," is the "earliest date on which
an Indeterminate Sentence Law or life prisoner may be legally released on parole" pursuant to
California regulations.  *See* Cal. Code. Regs., titl. 15,§ 3000.  *See also* Cal. Code. Regs., titl. 15,§
2000(b)(67).  As of the 2007 hearing, Petitioner's MEPD was December 21, 2000.

1   the record and constitute "some evidence" supporting the Board's decision that Petitioner was not

2   yet suitable for release on parole and remained an unreasonable risk of danger to society. *Sass*, 469

3   F.3d at 1129; *Irons*, 505 F.3d at 665.

4            The Board expressed concern with regard to Petitioner's inconsistent participation

5   in substance abuse programming while incarcerated.  By Petitioner's account, he had been drinking

6   for three or four days straight prior to as well as on the day of the commitment offense.  (Pet. Ex.

7   A at 24.)  Petitioner also stated during the hearing that his lifestyle at the time of the commitment

8   offense involved a lot of drinking and a lot of violence.  *Id*.  Petitioner admitted during the hearing

9   to smoking marijuana and selling PCP prior to his incarceration for the commitment offense.  The

10  record reflects, however, that his participation in substance abuse programming was irregular in that

11  he seemed to participate for three quarters out of each year, but also seemed frequently to fail to

12  participate in substance abuse programming during the fourth quarter of each year.  Despite

13  Petitioner's insistence that he did consider drugs or alcohol to be a factor in the commitment offense,

14  in light of his history of substance use and the involvement of alcohol in the commitment offense,

15  the Board advised Petitioner that he needed to be participating in some form of substance abuse

16  programming.  The Board clearly communicated that the programming did not have to be AA or

17  NA, but rather, could be any program of Petitioner's choosing.

18           The Ninth Circuit has recognized that although "it would likely violate [a prisoner's]

19  First Amendment rights to require him to attend [a faith-based program such as] AA as a condition

20  of parole . . . [t]he California Department of Corrections is, of course, free to impose other parole

21  conditions related to alcohol."  *Pirtle v. California Bd. of Prison Terms*, 611 F.3d 1015, 1024 n.6

22  (2010).  Given Petitioner's admitted history of substance use and the role of alcohol in his

23  commitment offense, it cannot be said that the Board was unreasonable in its determination that

24  Petitioner's lack of consistent and continuous participation in substance abuse programming was

25  insufficient to support the Board's finding that Petitioner remained an unreasonable risk of danger

26  to society.  "The parole board . . . undeniably does have a legitimate penological interest in

considering [parole candidates'] substance abuse backgrounds during the individualized inquiry for parole suitability." *Thompson v. Davis*, 295 F.3d 890, 898 n.4 (9th Cir. 2002).

Finally, the Board noted that a representative from the Fresno County District Attorney's office had appeared to oppose the granting of parole. Such opposition was properly noted and considered under Cal. Penal Code § 3046(c), however it does not constitute some evidence of Petitioner's unsuitability. *See In re Shippman*, 185 Cal.App.4th 446, 482 (2010) ("The District Attorney's 'opinion'...is not evidence and therefore does not constitute 'some evidence' supporting the...decision.") (quoting *In re Dannenberg*, 173 Cal.App.4th 237, 256 n.5 (2010).

After considering the above factors, the Board reasonably determined that Petitioner would pose an unreasonable danger to society or a threat to public safety if released from prison. Applying the federal *habeas corpus* review standard applicable to parole denials for California state prisoners, it appears that some evidence supports the Board's determination that Petitioner was not eligible for parole at the time of his 2007 hearing. The Board considered both positive and negative factors bearing on parole suitability, but ultimately concluded that the circumstances tending to demonstrate suitability for parole did not outweigh the circumstances tending to demonstrate that Petitioner was not yet suitable for parole. 15 CAL. CODE REGS. § 2402(b)-(d). The circumstances of Petitioner's commitment offense combined with his inconsistent participation in substance abuse programming provide the required modicum of evidence to support the Board's denial of parole. As reviewed above, relevant portions of the evidentiary record support the evidence cited by the Board in determining Petitioner was unsuitable for parole, providing a rational nexus between the evidence cited and the Board's ultimate conclusion that Petitioner remained an unreasonable risk of danger to the public. In addition, all factors articulated by the Board as a basis for its decision are permissible considerations in parole suitability determinations under California law. 15 CAL. CODE REGS. § 2402(b)-(d). While another panel might have reached a different conclusion based on the evidence, a reviewing court may not re-weigh the evidence before the Board, nor may a reviewing court substitute its own judgment for that of the Board.

19

1    The Board's decision thus withstands the minimally stringent some evidence

2  standard.  It is also clear from the record that Petitioner was given an opportunity to be heard during

3  his parole hearing and that he was informed of the reasons for the Board's decision, satisfying

4  federal due process.  Petitioner has received all process he was due and is not entitled to federal

5  *habeas corpus* relief on federal due process grounds.

6  **B.   Petitioner's Fourth and Fifth Remaining Claims**

7    **1.   Section 2402(c)(1) of the California Code of Regulations (Claim Four)**

8    Petitioner claims that the Board construes every indeterminately sentenced inmate's

9  commitment offense as "exceptionally heinous, atrocious, or cruel" under title 15, section 2402(c)(1)

10  of the California Code of Regulations and that none of the five factors listed under the regulation

11  provide a meaningful standard for narrowing the class of persons to which this regulation applies.

12  Accordingly, Petitioner claims that the Board's application of the regulation in his case was arbitrary

13  and capricious, thus rendering the statute unconstitutionally vague.

14    Section 2402(c)(1) sets forth the standards by which the Board determines whether

15  the timing and gravity of the commitment offense was carried out in "an especially heinous,

16  atrocious or cruel manner" such that the consideration of public safety requires a more lengthy

17  period of incarceration.  Specifically, the regulation sets forth a non-exhaustive list of five factors

18  to be considered, including:

19    (A) Multiple victims were attacked, injured or killed in the same or
20    separate incidents.

21    (B) The offense was carried out in a dispassionate and calculated
    manner, such as an execution-style murder.

22    (C) The victim was abused, defiled or mutilated during or after the
23    offense.

24    (D) The offense was carried out in a manner which demonstrates an
    exceptionally callous disregard for human suffering.

25    (E) The motive for the crime is inexplicable or very trivial in relation
    to the offense.

26

1   15 CAL. CODE REGS. §2402(c)(1).

2      Generally, a regulation is void for vagueness "if it fails to give adequate notice to

3   people of ordinary intelligence concerning the conduct it proscribes or if it invites arbitrary and

4   discriminatory enforcement." *United States v. Doremus*, 888 F.2d 630, 634 (9th Cir. 1989). *See*

5   *also Humanitarian Law Project v. Mukasey*, 509 F.3d 1122, 1134 (9th Cir. 2007) ("To survive a

6   vagueness challenge, the statute must be sufficiently clear to put a person of ordinary intelligence

7   on notice that his or her contemplated conduct is unlawful."); *Foti v. City of Menlo Park*, 146 F.3d

8   629, 638 (9th Cir. 1998) (A statue must be sufficiently clear so as to allow persons of ordinary

9   intelligence a reasonable opportunity to know what is prohibited.). "[A] party challenging the facial

10  validity of [a law] on vagueness grounds outside the domain of the First Amendment must

11  demonstrate that the enactment is impermissibly vague in all of its applications." *Hotel & Motel*

12  *Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 972 (9th Cir. 2003) (internal quotations

13  omitted). Moreover, "[t]he Due Process Clause does not require the same precision in the drafting

14  of parole release statues as is required in the drafting of penal laws." *Hess v. Bd. of Parole and Post-*

15  *Prison Supervision*, 514 F.3d 909, 914 (9th Cir. 2008) (citing *Glauner v. Miller*, 184 F.3d 1053,

16  1055 (9th Cir. 1999)). The statue need only make a "principled distinction" between those who are

17  suitable for parole and those who are not. *Id.*

18     Petitioner's claim that section 2402 is void for vagueness is without merit. As noted

19  above, the Board must take into consideration all of the factors set forth in section 2402(c)(1) in

20  determining whether a commitment offense was "especially heinous, atrocious or cruel" such that

21  it remains indicative of a prisoner's current risk of danger to society. The Board cannot merely

22  characterize a murder as heinous and deny parole. Indeed, several other district courts in this circuit

23  have recognized that "because these sub-factors [in section 2402(c)(1)] are set forth in simple plain

24  words, such that a reasonable person of ordinary intelligence would understand their meaning and

25  the conduct they proscribe, the notice requirement is satisfied." *Edwards v. Curry*, 2009 WL

26  1883739 at *9 (N.D.Cal. 2009) (citing *Hogue*, 752 U.S. at 1504); *see also Wagoner v. Sisto*, 2009

1    WL 2712051 at *6 (C.D.Cal. 2009) (stating that "the five sub-factors outlined in § 2402(c)(1)(A)-(E)

2    serve to limit the 'heinous, atrocious or cruel' language of section 2402(c) and narrow the class of

3    inmates that are found unsuitable for parole...thus, the terms are not unconstitutionally vague.").

4    Because the term "especially heinous, atrocious, or cruel" is further limited by these five detailed

5    factors, it is not unconstitutionally vague. *See Arave v. Creech*, 507 U.S. 463, 470-78 (1993) (Idaho

6    death penalty statute which cited as an aggravating factor that the crimes were carried out in "utter

7    disregard for human life" was not impermissible vague because limiting construction had been

8    adopted defining this factor as demonstrating "the utmost disregard for human life, i.e. the cold-

9    blooded pitiless slayer").

10         In addition, the sections of the California Code of Regulations governing parole

11    determinations have not been found to be unduly vague or overbroad under federal law.  Nor has

12    federal law been found to preclude the use of terms such as "especially cruel" or "callous as

13    guidelines in parole suitability evaluations.  *Cf. Maynard v. Cartwright*, 486 U.S. 356, 363-64

14    (1988) (in a capital case, the "especially heinous, atrocious or cruel" aggravating circumstance was

15    unconstitutionally vague because it did not offer sufficient guidance to the jury in deciding whether

16    to impose the death penalty); *Tuilaepa v. California*, 512 U.S. 967, 972 (1994) (noting that statutory

17    aggravating circumstances in capital cases "may not be unconstitutionally vague").  Accordingly,

18    Petitioner is not entitled to federal *habeas corpus* relief on this claim[6]

19    _____

20         [6] Petitioner has also requested that the court take judicial notice of four state court cases
pending in Santa Clara County, including Criscione (no. 71614), Jameison (no. 71194), Bragg (no.

21    108543) and Ngo (no. 127611).  On August 30, 2007, the Santa Clara County Superior Court issued
five substantially identical orders in those four cases as well as an additional case, *In re Lewis* (no.

22    68038).  The only differences in the five orders "were in the case captions and in footnote 1, in
which the superior court took judicial notice of, and referenced by name, the other four

23    proceedings."  *In re Lewis*, 172 Cal. App.4th 13, 17 n.2 (2009).  Petitioner contends that these orders
establish that in "well over 90% of the cases that appeared in front of the Board, the panel had found

24    the commitment offense to be 'especially heinous, atrocious or cruel' as set fort in Title 15 § 2402
(c) (1).  In the remaining 10% of the cases either parole had been granted, or it was unclear whether

25    § 2402 (c) (1) was the reason for parole denial."  (Pet. at 36).

26         The decision of the Santa Clara County Superior Court has now been reversed on appeal.
*In re Lewis*, 172 Cal.App.4th at 13.  Moreover, even if the decision had not been reversed, it could

## 2.      Separation of Powers Doctrine (Claim Five)

Petitioner's fifth and final claim is that the Board has violated the separation of powers doctrine by failing to comply with section 3041 of the California Penal Code, thus "usurp[ing] the legislative function and appropriat[ing] to itself absolute power over lifer inmates." (Pet. at 39.)  It is unclear, however, whether Petitioner is claiming that the Board has violated the separation of powers doctrine under the federal or state constitution.  Regardless, Petitioner's claim must fail.  A claim that the Board violated the federal constitution is not cognizable because the federal doctrine of separation of powers does not extend to the states under the Fourteenth Amendment.  *See Hughes v. Superior Court*, 339 U.S. 460, 467 (1950) ("[T]he Fourteenth Amendment leaves the States free to distribute the powers of government as they will between their legislative and judicial branches.").  Thus, Petitioner cannot claim that the federal separation of powers doctrine applies to the Board's actions as the Board is a state agency.  A claim that the Board violated the separation of powers doctrine contained in the California state constitution does not give rise to a claim for federal *habeas corpus* relief.  *See Middleton v Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985).  Petitioner is thus not entitled to federal *habeas corpus* relief on this claim.

## VI.  CONCLUSION

IT IS RECOMMENDED that Petitioner's petition for writ of *habeas corpus* be denied.  These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections

not control the results of Petitioner's case.  A federal court may take judicial notice adjudicative facts "concerning the immediate parties–who did what, when, how and with what motive or intent–...."  Advisory committee notes to FED. R. EVID. 201(a).  Petitioner's request for judicial notice does not pertain to the immediate parties.  A federal court may also take judicial notice of a fact that is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  FED. R. EVID. 201(b).  The statistics determined in the superior court are not "generally known" or "capable of accurate and ready determination."  *Id*.  Petitioner's request for judicial notice must be denied.

with the court and serve a copy on all parties.  Such a document should be captioned "Objections

to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served

and filed within seven days after service of the objections.  Failure to file objections within the

specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d

449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In any objections he elects

to file petitioner may address whether a certificate of appealability should issue in the event he elects

to file an appeal from the judgment in this case.  *See* Rule 11, Federal Rules Governing Section 2254

Cases (the district court must issue or deny a certificate of appealability when it enters a final order

adverse to the applicant).

DATED: December 3, 2010

_____

CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE